UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF MANUEL VERDUGO, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>CITY OF EL CENTRO, et al.,<br>                              Defendants. | Case No.:  20-CV-2458 W (KSC)<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE THIRD CAUSE OF ACTION [DOC.  25]** |

Pending before the Court is a motion to dismiss for failure to state a claim brought by Defendant City of El Centro (the "City").  Plaintiffs oppose the motion.

The Court decides the matter on the papers submitted and without oral argument. *See* Civ. R. 7.1(d)(1).  For the following reasons, the Court **DENIES** the motion [Doc. 25].

//

//

I.    **FACTUAL BACKGROUND**

The following allegations are taken from the First Amended Complaint ("FAC"). (*FAC* [Doc. 23].)

Plaintiffs Stacy and Sacramento Verdugo are the children of decedent Manuel Verdugo ("Verdugo") who was fifty years old at the time the events of this action occurred. (*Id.* ¶ 4.) Verdugo suffered from bipolar disorder and in late December 2019 reported feeling suicidal. (*Id.* ¶ 12.) On December 24, 2019, Verdugo was staying in a motel in El Centro and called 911 to request help for suicidal feelings. (*Id.* ¶ 13.) One of the officers who responded to the December 24 call was Defendant Manuel Meza ("Meza"), who spoke at length with Verdugo about his mental health before transporting him to the hospital for treatment. (*Id.* ¶ 14.)

On December 29, 2019, shortly before 7:00 a.m., Verdugo entered Rite Aid in El Centro at Imperial and Main Streets and asked the Store Manager whether the store carried any knives. (*Id.* ¶ 15.) The manager showed Verdugo a package of steak knives with four-inch, serrated blades. (*Id.* ¶ 16.) Without paying, Verdugo opened the package of knives and walked out of the store with two of the knives in hand. (*Id.*) Outside the store, Verdugo spoke with a Rite Aid employee named Victoria. (*Id.* ¶ 17.) Verdugo refused to return the knives and told Victoria to "call the police," specifically an "Officer Rodriguez." (*Id.*) Verdugo also told Victoria that "they killed my family." (*Id.*) The store manager then called 911 and reported the theft of the knives to the dispatcher, Defendant Jane DOE 2, stating erroneously that Verdugo had said he was going to "kill Officer Rodriguez." (*Id.* ¶ 18.) The manager also told the dispatcher that he was not sure if Verdugo was "all right in the head." (*Id.* ¶ 19.)

After exiting the store, Verdugo proceeded walking down the middle of the street near the store while shouting to himself and taking off his clothes. (*Id.* ¶ 20.) Additional 911 calls were made reporting Verdugo's behavior during this time. (*Id.* ¶ 21.) The 911

dispatcher did not relay the manager's comment that the manager was unsure whether Verdugo ws "all right in the head," nor that Verdugo was "yelling to himself," but rather that Verdugo was simply "yelling." (*Id.* ¶ 22.) The dispatcher falsely relayed to the officers that Verdugo has expressed an intention to "kill an officer." (*Id.*) Defendants Stephen Singh ("Singh"), Fernando Garcia ("Garcia"), and Meza all arrived at the scene in separate vehicles around 7:11 a.m. at the intersection of Imperial and Main Streets. (*Id.* ¶ 23–24.) As the officers were arriving, Verdugo was shirtless and carrying a steak knife in each hand, essentially walking perpendicular to the approach of the officers. (*Id.* ¶ 24.) As the officers approached him, Verdugo turned away and walked in the opposite direction of the officers. (*Id.*) At the time, there was little traffic and no pedestrians in the area. (*Id.* ¶ 25.)

Defendants Singh and Garcia both drew and pointed their guns at Verdugo as he walked away from them, and all three Defendants shouted various commands to Verdugo. (*Id.* ¶ 26.) Verdugo ignored the commands and continued walking away, heading west in an empty eastbound land of Main Street and, at times, holding his hands up in the air. (*Id.* ¶ 27.) Garcia and Singh instructed Meza to "go around." And Meza proceeded to quickly drive his patrol vehicle westbound on Main Street. (*Id.* ¶ 28–29.) Meza passed Verdugo, made a U-turn, and began driving back eastbound directly at Verdugo. (*Id.* ¶ 29.) At the same time, Singh drove his vehicle close behind Verdugo from the east and got out of his car, blocking Verdugo in from the rear. (*Id.* ¶ 30.) Simultaneous to Meza and Singh's actions, Garcia obtained a "less lethal" shotgun from Defendant Sergeant Damian Valdez ("Valdez") who had just arrived at the intersection in his own vehicle. (*Id.* ¶ 31.) Garcia ran west along the north flank of Verdugo on the opposite side of Singh's patrol vehicle from Verdugo. (*Id.*) Valdez, seeing what was happening, drove forward. (*Id* ¶ 32.)

Seeing Meza driving directly at him, Verdugo reversed directions and jogged back eastward on Main Street in the direction of the other officers so that he was facing into the

sunlight.  (*Id.* ¶ 33.)  Garcia shouted, "get down, get down, less lethal, less lethal," and fired the less lethal bean bag shotgun at Verdugo, essentially driving Verdugo into a narrow space between the retaining wall at the edge of the sidewalk and Singh's parked vehicle.  (*Id.* ¶ 34–35.)  Garcia fired a second less lethal projectile at Verdugo.  (*Id.* ¶ 36.)  Valdez began to exist his vehicle shouting, "Get him! Get him! Get him!"  (*Id.* ¶ 37.)  Singh drew his handgun and fired three shots at Verdugo from approximately twenty feet away.  (*Id.* ¶ 38.)  Verdugo staggered turned away from Singh, covered his face with his hands, and began to fall.  (*Id.*)  Valdez, now outside of his vehicle a few feet south of Singh's vehicle, then drew his own handgun and shot Verdugo approximately nine times while Verdugo was falling with his back turned to Valdez.  (*Id.* ¶ 39.)  Garcia fired a single shot from his handgun as Verdugo was lying face down on the ground.  (*Id.* ¶ 40.)  Verdugo was pronounced dead at the scene.  (*Id.* ¶ 42.)

From the time Singh, Meza, and Garcia arrived at the intersection to the time Verdugo was shot, only forty-five seconds had elapsed.  (*Id.* ¶ 41.)  Verdugo's autopsy results indicated that two of the shots that hit Verdugo were fatal; one in the back and one in the back of the neck.  (*Id.* ¶ 43.)

Defendant City of El Centro now seeks the dismissal of the third cause of action.  (*See MTD*.)

## II. LEGAL STANDARD

The court must dismiss a cause of action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint.  *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory.  *Balisteri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990).  In ruling on the

motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).  But a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Complaints must contain "a short plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to rise above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).  A court should grant leave to amend unless the plaintiff could not possibly cure defects in the pleading. *Knappenberger v. City of Phoenix*, 556 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)).

**III.   DISCUSSION**

Plaintiffs' third cause of action alleges violations of Verdugo's civil rights under 42 U.S.C. §§ 1983 and 1988 based on several different theories, including: (1) failure to train dispatchers; (2) failure to train police officers; (3) a city policy of using excessive force when interacting with mentally ill individuals; (4) ratification of the officers' allegedly unconstitutional actions.  If any one of these theories sufficiently states a claim under § 1983, then the cause of action cannot be dismissed under Rule 12(b)(6). *See* FED. R. CIV. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); *see also Haddock v. Bd. of Dental Exam'rs of Cal.*, 777 F.2d 462, 464 (9th Cir. 1985) (stating

that "a complaint should not be dismissed if it states a claim under any legal theory, even if the plaintiff erroneously relies on a different legal theory"). In seeking dismissal of this cause of action, Defendant argues that each one of Plaintiffs' theories fails to sufficiently state a claim under 42 U.S.C. § 1983. The Court disagrees.

### A.    **Failure to Train**

Plaintiffs assert that El Centro should be liable for a violation of § 1983 for failure to train because the City's policies, practices, and customs were a proximate cause of Verdugo's death. Specifically, Plaintiffs allege that Defendants Valdez, Singh, Garcia, and Meza lacked sufficient training to respond to situations with mentally ill individuals and, as a result, acted in a manner that violated Verdugo's civil rights. (*See FAC* ¶¶ 63–81.)

To establish a § 1983 claim against a local government entity for failing to act to preserve a constitutional right, a plaintiff must establish: (1) his or her constitutional right was violated; (2) the municipality had a policy; (3) the policy "amounts to deliberate indifference" to plaintiff's constitutional right; and (4) the policy is the "moving force behind the constitutional violation." *Lockett v. Cty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). To state a Monell claim for pattern or practice, the FAC therefore must sufficiently allege that the "unconstitutional action 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Rivera v. Cnty. of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014) (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. 2018). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403–404 (1997).

This Court already held that the allegations in this case against Defendant Valdez and Defendant Garcia sufficiently allege that these officers violated Verdugo's constitutional rights. (*Order on First MTD* [Doc. 21] at 21, 23.) We turn then to the second prong of the *Lockett* analysis, whether the municipality had a policy. *See Lockett*, 977 F.3d at 741.

A plaintiff may establish municipal liability upon a showing that there is a permanent and well-settled practice by the municipality which gave rise to the alleged constitutional violation. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). A "policy of inaction" can satisfy this prong. *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). A plaintiff therefore may establish Monell liability by demonstrating that the alleged constitutional violation was caused by a failure adequately to train municipal employees. *See City of Canton, Ohio*, 489 U.S. at 388–91; *Garmon v. Cty. of Los Angeles*, 828 F.3d 837, 846 (9th Cir. 2016).

Plaintiffs allege that the City:

- "fail[ed] to adequately train, supervise, and control deputies in the safe interaction with, detention of, and the appropriate uses of force, in regard to handling situations with people such as Plaintiff's Decedent VERDUGO, who are disabled as the result of mental illness and whose behavior is impacted by such illness" (*FAC* ¶ 72.a.);

- "fail[ed] to set up a system for rapid response to situations potentially involving an encounter with a mentally disturbed person, where intervention by a highly trained and skilled person might alleviate the need for the use of force, particularly lethal force, by resorting to alternative methods including de-escalation, communication, or specialized help" (*FAC* ¶ 72.c.);

- "fail[ed] to set up systems to prevent abuse by officers including the failure to properly investigate timely and, when appropriate, discipline uses of force" (*FAC* ¶ 72.d.);
- "condon[ed] and encourage[ed] officers in the belief that they can violate the rights of persons such as VERDUGO with impunity, knowing that their conduct will not adversely affect their opportunities for retention, promotion, and other employment benefits" (*FAC* ¶ 72.e.);
- "fail[ed] to terminate or otherwise discipline officers who abuse their authority" (*FAC* ¶ 72.f.);

Plaintiffs further allege that the "CITY OF EL CENTRO has seen several serious incidents of police responding unreasonably in recent years in response to individuals acting erratically." (*FAC* ¶ 63.) They allege that the City "paid a $4.1 million settlement . . . to the family of Charlie Sampson, who died after EL CENTRO police officers spent hours ignoring Sampson's obvious symptoms of methamphetamine overdose." They allege that, in 2016, City police offices used excessive force against a man who was not resisting. (*FAC* ¶ 65.) And they allege that a City police officer "fired more than 50 shots at a man" in 2014, which the complaint alleges was a "massive over-response" against a man who had "raised his hands to surrender." (*FAC* ¶ 66.)

Plaintiffs allege that "these acts were part of a widespread municipal policy, practice and custom of the Defendant CITY OF EL CENTRO, and DOES 9 through 10, inclusive, that failed to consider that despite the knowledge that encounters with mentally disturbed individuals are common, and often occur, and the foreseeable likelihood of a tragic or traumatic result might occur based on the level or adequacy of training officers receive, and that if the officers were properly trained the likelihood of a serious injury or death could be seriously reduced." (*FAC* ¶ 73.) They allege that "these polices, practices and customs, separately and together, proximately caused injury and death to VERDUGO

8

because Defendants SGT. VALDEZ, and OFFICER GARCIA, along with Officers Singh and Meza, lacked sufficient training in how to respond to encounters with mentally disturbed persons." (*FAC* ¶ 74.)  And they allege that these "policies, practices and customs . . . were maintained and implemented with deliberate indifference, and thereby encouraged Defendants SGT. VALDEZ, and OFFICER GARCIA to commit the wrongful acts against VERDUGO." (*FAC* ¶ 80.)

Plaintiffs buttress the allegations of past patterns and practices with allegations regarding El Centro Police Department's participation in "the development of a 2020 Imperial County Roadmap Report on training deficiencies and inadequate responses to 5150 incidents." (*FAC* ¶ 68.)  The Court agrees with Defendant that the Report [Doc. 25-2] is properly judicially noticed and it is hereby incorporated by reference as part of the FAC for purposes of Defendant's motion to dismiss.  *See Khoja v. Orexigan Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  The Report noted that "many LEOs in [Imperial] County stated they felt ill equipped to provide support during [mental health] crisis event[s] and to make 5150 determinations" (Report at 18), that "LEOs do not feel they have adequate training on the 5150 criteria, hindering their ability to recognize gravely disabled individuals" (Report at 19), and that "current training for this group does not appear to adequately prepare first responders to deal with a mental health crisis" (Report at 28).

Defendant argues that the FAC takes the Report "out of context" and cites several other portions from the report in arguing that the Report's content defeats Verdugo's claim.  Defendant also argues that Plaintiffs' allegations fail to state a claim under Monell because the previous incidents alleged by Plaintiffs are not "closely related to the alleged pattern and practice." (*MTD* at 6.)  Valid as these arguments may be, they say nothing of the sufficiency of the allegations in the FAC.  Defendant's arguments as to these allegations may be plausible, but a "complaint may be dismissed only when defendant's

plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis in original). Plaintiffs' explanations as alleged in the FAC are not implausible.

Plaintiff have satisfied the requirements of Rule 12(b)(6) by asserting plausible factual allegations regarding the City's failure to train that, if proven, would establish each of the elements of his Monell claim.  Plaintiffs sufficiently allege that the City failed to adequately train its employees, that the City failed to set up systems to prevent officer abuse and respond to situations potentially involving an encounter with a mentally disturbed person, and that the violation of Verdugo's constitutional rights was part of a pattern and practice of the City.  Accepting these factual allegations as true and drawing all reasonable inferences in favor of Plaintiffs, as the Court must do at this stage of the lawsuit, the Court concludes that Plaintiffs have adequately alleged that the City has the requisite custom or practice, that the City acted with deliberate indifference, and that the City's custom or practice and actions and omissions caused the death of Verdugo.

Since the Court finds that Plaintiffs' factual allegations as to the City's failure to train sufficiently state a claim for a violation of § 1983, the Court does not reach Defendant's arguments as to Plaintiffs' other theories.  As noted above, a cause of action should not be dismissed if it states a claim under any legal theory, even if there are other theories alleged.  *See* Fed. R. Civ. P. 8(d)(2); *Haddock*, 777 F.2d at 464.

Defendant's motion to dismiss the third cause of action is **DENIED**.

IV. **CONCLUSION & ORDER**

For the reasons stated above, the Court **DENIES** City's motion [Doc. 25].

**IT IS SO ORDERED.**

Dated:  November 1, 2022

Hon. Thomas J. Whelan
United States District Judge

11